UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| THERESA G. BOSTIC, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>MICHAEL J. ASTRUE, )<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | Case No. 1:07CV0002 CDP/AGF |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Theresa Bostic's application for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-1384f. The action was referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b) for recommended disposition. For the reasons set forth below, the Court recommends that the decision of the Commissioner be affirmed.

Plaintiff, who was born on February 22, 1961, applied for SSI benefits on November 19, 2003, alleging a disability onset date of July 1, 2001, due to back problems. After her application was denied at the initial administrative level, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held on January 24, 2006, at which Plaintiff was represented by counsel. On August 22, 2006, the ALJ issued a decision that Plaintiff was not disabled as defined by the Act. The

Appeals Council of the Social Security Administration ("SSA") denied Plaintiff's request for review on November 8, 2006. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action, subject to judicial review.

Plaintiff argues that the ALJ applied an improper standard when assessing Plaintiff's pain, failed to give appropriate weight to Plaintiff's subjective complaints, and failed to assess Plaintiff's combination of impairments and their total impact on Plaintiff.

**Earnings Record and Application Forms**

Plaintiff's earning record shows no earnings from 1991 through 2003, with the exception of $20 in 1991 and $140.80 in 1995. (Tr. at 106-07.) On her Work History Report, dated December 6, 2003, Plaintiff indicated that her only prior work was as a short-order cook for three weeks, eight years ago, and that she had to quit that job because of back problems. Id. at 117.

On her application for benefits, Plaintiff indicated that she folded laundry, sitting down; did dishes, made the beds, vacuumed/swept a little bit, then had to sit down; and took out the trash in small bags. She indicated that she did not do home repairs or yard work, or go to the post office. Plaintiff wrote that she went shopping about once a week, and prepared simple meals, but because of her back pain and inability to stand too long, she could not cook things she used to. She wrote that she spent most of her day cleaning the house, small parts at a time and sitting down intermittently, and cooking meals. When she watched TV, she had to change positions and sometimes used a heating pad due to her back pain. Id. at 123-24.

**Medical Record[1]**

On July 24, 2002, Plaintiff was seen at a clinic, complaining of back pain of one day's duration. Plaintiff reported that she pulled a muscle the previous day while getting dressed. Plaintiff came under the care of Dick Newell, D.O., and Sherry Limbaugh, R.N., was told to apply heat, and was given a ten-day supply of Naprosyn (a nonsteroidal anti-inflammatory drug, or "NSAID") and a drug used for pain associated with musculoskeletal injuries. Id. at 261-62. Medical notes from the clinic dated August 13, 2003, indicate that Plaintiff visited the clinic on that day complaining of moderate low back pain of two years' duration. An x-ray, identified as a "limited study," of Plaintiff's lumbar spine showed no gross abnormality, and she was prescribed Naprosyn. Id. at 255-57.

Plaintiff returned to the clinic on October 29, 2003, stating that she now had Medicaid and wanted an MRI of her lumbar spine. The record indicates that an MRI was performed on that day and discussed with Plaintiff at a follow-up visit on November 19, 2003, at which time Plaintiff was continued on Naprosyn and started on Elavil (used for relief of depression). Id. at 143-45. The MRI showed evidence of some early degenerative changes in the L4-L5 and L5-S1 discs, with mild reduction in height at L5-S1. There was no evidence of spinal canal or neuroforaminal stenosis or significant disc intrusion into the canal or foramen. Id. at 156-57.

---

[1] The Court notes that several medical reports appear in the record twice.

When Plaintiff was seen for follow-up on December 3, 2003, she was assessed with chronic back pain and degenerative disc disease of the lumbar spine. Her treatment plan consisted of physical therapy and medications. Id. at 141-42. MRIs taken on December 8 and 15, 2003, of the cervical spine showed mild cervical spondylosis and minimal neuroforaminal narrowing at C4-C5 and C5-C6, with no stenosis or cord impingement. The cervical spine was normal in all other regards. Id. at 151-52, 172. An MRI of the thoracic spine taken on December 8, 2003, showed tiny right paracentral disc protrusion at T11-T12, without associated central stenosis or foraminal narrowing. Id. at 153.[2]

A Report of Contact dated February 27, 2004, stated that Plaintiff called the SSA to report that she had seen Patrick Lecorps, M.D., who told her that he would give her shots for her back problem for about three weeks and if things did not get better, he wanted to do surgery. Id. at 128. On April 20, 2004, Plaintiff established care with Mayur Ramesh, M.D., who noted that Plaintiff had a history of low back pain, for which she was taking Naprosyn, Soma, and Lorcet, but only occasionally. Dr. Ramesh suggested physical therapy with heat ultrasound mobilization, and trial TENS[3] treatment.

---

[2] The record includes a Physical RFC Assessment completed on January 16, 2004, by a non-medical source. Id. at 158-165.

[3] TENS (Transcutaneous Electrical Nerve Stimulation) is a treatment for pain in which pads are placed near the area of pain and electrical pulses are sent via the pads through the skin along the nerve fibers. The pulses suppress pain signals to the brain.

He also advised Plaintiff, who weighed 175½ pounds (and was approximately 5'), to increase activity and lose weight. Id. at 179-80.

At a follow-up visit on May 18, 2004, Plaintiff complained of "some malaise." Dr. Ramesh noted that Plaintiff had finished her physical therapy and seemed to be doing a little bit better, but that her pain seemed to be on and off. Id. at 178. In progress notes dated June 1, 2004, Dr. Ramesh reported that there was evidence of some degenerative disc disease but no evidence of obvious nerve root compression. Plaintiff was continued on her medications, and again advised to increase her level of activity and lose weight. Id. at 177.

In two Medical Vocational Statements file-stamped in May and June 2004, Plaintiff wrote that her back pain had gotten worse since she requested an evidentiary hearing, and that Drs. Ramesh and Lecorps wanted to do surgery. Id. at 129-34. On September 21, 2004, Nurse Limbaugh noted on a prescription pad that Plaintiff was unable to work due to chronic back pain. And on September 22, 2004, Dr. Ramesh wrote on a prescription pad that Plaintiff had chronic pain in the lower back due to significant degenerative arthritis of the spine, "(proven by MRI)," and was not able to stand or sit for prolonged periods, a condition which Dr. Ramesh did not believe would improve in the future. Id. at 167. In progress notes from the same day, Dr. Ramesh wrote as follows:

> [Plaintiff] has chronic mid to low back pain and is finding it difficult to sit or stand for long periods of time because of same. She has had MRI of the C-spine, thoracic and lumbosacral spine proving degenerative joint disease. She needs a letter to social security explaining the same and I have given

> her a letter explaining that she is unable to stand or sit for prolonged
> periods of time so it would be hard for her to work because of the same.

Id. at 176. Dr. Ramesh gave Plaintiff refills of Naprosyn, Soma, and Lorcet, noting that she was trying to avoid narcotic pain medication. On examination, he noted that Plaintiff was not able to turn her back significantly because of mid-back pain. He advised Plaintiff on weight loss as a way to help her back, and noted that Plaintiff was going to follow up with him about twice a year for other health maintenance issues. Id.

New MRIs of the cervical, lumbar, and thoracic spines were taken on September 24, 2004, due to Plaintiff reporting neck pain with right upper extremity pain and numbness. The MRI of the cervical spine showed mild to moderate foraminal narrowing at C4-C5, minimal foraminal narrowing at C5-C6, and minor facet atrophy at C6-C7. Id. at 169-70. The MRI of the lumbar spine showed mild disc narrowing L5-S1, with other disc heights maintained, and very mild disc bulging at T12-L1. Id. at 171. An x-ray taken on September 29, 2004, showed normal bone density. Id. at 182. The MRI of the thoracic spine was normal. Id. at 183. These test results were discussed with Plaintiff on October 4, 2004. She complained of low back pain, at times with a burning sensation, and of difficulty sleeping. Plaintiff was told to continue taking Soma and Hydrocodone to help her rest better. Id. at 214.

Plaintiff visited the clinic on February 1, 2005, for refill of her pain medication, which at that point was Darvocet. She complained of lower back pain, radiating down to her right hip and right knee. Id. at 205. A February 10, 2005 MRI of Plaintiff's lumbar

6

spine showed some mild disc bulges and mild neuroforaminal narrowing, with no significant central stenosis or osteoarthritic changes of the lumbar facets.  <u>Id.</u> at 174.  On February 18, 2005, it was noted that Plaintiff was taking Vicodin for severe low back pain.  <u>Id.</u> at 204.

**<u>Evidentiary Hearing of April 7, 2005</u>**

Plaintiff testified at the evidentiary hearing that she was 44 years old, had a ninth grade education, was approximately 5' 1", and weighed 165 pounds.  She testified that the only job she had ever held was flipping hamburgers at a fast food restaurant for about two months, about ten years ago.  She could not continue at that job because it required that she stand in one place and turn back and forth, which caused pain in her lower back, shooting down her legs.  Plaintiff testified that her only current medical problem was her back, which hurt constantly, prevented her from sleeping at night, and required her to take pain pills (including Naproxin) and a muscle relaxant.  She stated that the problem began about three years prior, and "started getting worse."   She did not recall any traumatic beginning of the problem.  Plaintiff reported that her current doctor prescribed three types of pills for her, and did not say anything to her about surgery to fix the problem.  Her previous doctor told her not to lift anything over a gallon of milk.  <u>Id.</u> at 31-36.

Plaintiff testified that her husband, who was disabled due to a tremor condition, and daughter helped with all the household chores, and went with her to do grocery shopping.  She later testified that it had been about a year since she was able to do the

shopping on her own.  Plaintiff testified that she would have to sit down "whenever the pain comes on" and that lately, this would occur "quite frequently."  Also, she could only stand for "so long" before feeling a shooting pain down one of her legs, and about five of six times, this pain had been so severe that it caused her to pass out.  She never had a driver's licence, because driving made her dizzy, and she was afraid she might pass out at the wheel, although she never mentioned this condition to a doctor.  Id. at 37-43.

Plaintiff testified that the heaviest thing she lifted was a gallon of milk, and that if she tried to lift anything heavier, she experienced back pain.  She stated that due to her back pain, she could only sit for about 15 to 30 minutes before having to stand up, and she had to lie down about three times a day.  She spent her days watching TV, sitting a little bit and then standing a little bit; listening to music; reading a little; and talking on the phone.  She went to church on Sunday mornings and Sunday nights, and was able to sit for about 30 minutes before her back discomfort got severe.  Plaintiff testified that she was taking Naproxin 500 mg., Soma, 350 mg., and Vicodin, 650 mg.  Id. at 43-45.

In response to questioning by the ALJ, the VE testified that if Plaintiff, because of back problems, could not lift anything over 20 pounds, could lift items up to 10 pounds frequently, but items between 10 and 20 pounds only occasionally; had to sit and stand alternately through the workday, changing position every half hour to 45 minutes, but could otherwise  "maintain herself at the workstation" with proper attention and concentration, there would be jobs she could perform, such as hand packer, some assembly work, parking lot attendant, and cashier in a small restaurant, all of which

existed in significant numbers in the local and national economy and involved unskilled, light work. The VE testified, however, that if Plaintiff had to leave the work station two or three times a day to lie down for half an hour or so, she could not perform any of the identified jobs on a regular basis. Id. at 47-49.

**Post-hearing Medical Evidence**

Clinic notes dated March 16, 2005, state that Plaintiff refused to see a neurosurgeon and did not want surgery. Id. at 200.

On September 20, 2005, Plaintiff was seen by Dr. Lecorps for an orthopedic evaluation. Plaintiff reported that she had had back pain radiating down to both legs for the past four years. She did not think that it was related to any particular injury; rather she woke up one morning with this pain and it had been present ever since. Plaintiff stated that she had problems falling asleep and she described the pain as sharp in nature. Her current medications were Naprosyn and Vicodin, which Plaintiff reported she had been on for the past two years. On examination, Dr. Lecorps noted no leg strength discrepancy and no pelvic tilt. Plaintiff was able to bend over and touch her toes, hyperextension of the lumbar sacral spine was possible, lateral flexion was normal, and tendon reflexes of the knees and ankles were normal. A straight leg raising test was about 85 degrees bilateral with very little or no pain.[4] The Foraminal Compression test, Fabere

---

[4] A test to determine whether a patient with low back pain has an underlying herniated disk. Sciatic pain before 70 degrees is considered a positive result.

test, and Nafzigger's signs were all negative.[5] Based upon his examination and review of the x-ray evidence, Dr. Lecorps concluded that Plaintiff had chronic low back pain due to degenerative disc disease of the L5-S1, possibly related to weight. Id. at 281.

An MRI of the lumbar spine performed on November 22, 2005, showed two bulging discs at L3-L4, with very minimal foraminal encroachment, a disc bulge at L4-L5, which was slightly larger, and a disc bulge at L5-S1, which did not displace the S1 nerve root. The MRI showed bilateral facet atrophy, which Dr. Lecorps believed was the main cause of Plaintiff's pain. Plaintiff had no central spinal stenosis, and Dr. Lecorps believed that she would benefit from epidural steroid injections, NSAIDs, and muscle relaxers. Id. at 284-86.

**ALJ's Decision of August 22, 2006**

The ALJ noted that as SSI benefits were not retroactive beyond the date of the application, evidence pre-dating November 19, 2003, was relevant only for historical context. The ALJ found that Plaintiff's disc disease more than minimally limited her ability to do basic work activities, and was, thus, a severe impairment under the Commissioner's regulations, but the ALJ found that it was not severe enough to meet the Commissioner's listings for a deemed-disabling impairment. The ALJ dismissed Plaintiff's allegation of disability due to fainting episodes, finding that the medical record was devoid of evidence to corroborate this allegation.

---

[5] These tests use various techniques of manipulation and pressure to detect musculoskeletal abnormalities, such as pressure upon a nerve or pathology in the hip.

The ALJ then proceeded to consider whether, despite her disc disease, Plaintiff had the residual functional capacity ("RFC") to perform work existing in the national economy in significant numbers, citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1321-22 (8th Cir. 1984), as setting for the factors relevant to this inquiry. The ALJ stated that the medical imaging of Plaintiff's cervical, thoracic, and lumbar spines in late 2003, September 2004, and November 2005, essentially showed no more than mild abnormalities, noting that although the November 22, 2005 MRI showed contact of the L5 nerve root by a disc, the nerve root was not displaced. The ALJ noted that additionally, the results of physical examinations by Drs. Ramesh (April, June, and September 2004) and Lecorps (September 2004) were, "by and large, unremarkable." The ALJ mentioned Dr. Ramesh's conclusion that Plaintiff could not sit or stand for prolonged periods, but also noted that Dr. Ramesh did not conclude that Plaintiff was disabled. <u>Id.</u> at 19.

The ALJ discounted Nurse Limbaugh's September 21, 2004 note that Petitioner was unable to work, on the ground that a nurse is not an "acceptable medical source." The ALJ noted that in any event, Nurse Limbaugh's opinion deserved only "slight weight" because it was "grossly inconsistent with the exam results obtained at the clinic." <u>Id.</u>

The ALJ also found that Plaintiff lacked credibility. The ALJ noted that Plaintiff testified that she needed assistance from her daughter or husband with her daily chores, but did not mention needing such assistance in her report of daily activities submitted

with her application for benefits. The ALJ believed that Plaintiff's testimony that her back pain was constant and that she had to lie down up to three times a day because of the pain was inconsistent with her refusal to visit a neurosurgeon. In addition, the record did not show the need for treatment other than medication, or the need for an assistive device such as a cane. The ALJ also noted that Plaintiff's earning record was "unimpressive." Id.

The ALJ found that Plaintiff had the RFC to lift 20 pounds occasionally and ten pounds frequently; sit six hours in an eight-hour day; and stand or walk a total of six hours in an eight-hour day, requiring a sit/stand option every 30-45 minutes at the work station. This constituted a limited range of light work.[6] The ALJ found credible the VE's testimony that a person with this RFC and Petitioner's vocational factors could perform the jobs identified by the VE, which existed in significant numbers. Based upon this testimony, the ALJ concluded that Plaintiff was not disabled, as that term is defined in the Social Security Act. Id. at 20.

**New Medical Evidence before the Appeals Counsel**

On September 10, 2006, Plaintiff was admitted to the emergency room after she passed out at home. It was noted that Plaintiff had a history of passing out two to three times a year. A CT head scan and an x-ray of the cervical spine were both normal. Plaintiff was diagnosed with syncope, chronic neck pain, and microcytic anemia (most

---

[6] "Light" work is defined in 20 C.F.R. § 416.967(b).

commonly, iron deficiency anemia), and released with instructions to rest, take plenty of liquids, and follow-up with her own doctor. Id. at 288-96.

## **DISCUSSION**

### **Standard of Review and Statutory Framework**

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Work which exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Id. § 423 (d)(2)(A). Both the

impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix I. If the claimant's impairment is equivalent to a listed impairment, the claimant is conclusively presumed to be disabled. Otherwise, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work, if any. If the claimant has past relevant work and is able to perform it, he is not disabled. If he cannot perform his past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant

number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment. Where a claimant cannot perform the full range of work in a particular category listed in the Guidelines, due to nonexertional impairments such as pain, the ALJ cannot carry this burden by relying exclusively on the Guidelines, but must consider testimony of a VE.

**ALJ's Assessment of Plaintiff's Complaints of Pain**

Plaintiff argues that the ALJ applied an improper standard when assessing Plaintiff's pain, and failed to give appropriate weight to Plaintiff's subjective complaints. Specifically, Plaintiff argues that the ALJ improperly required objective evidence of pain. In Polaski, 739 F.2d at 1332, cited by the ALJ, the Eighth Circuit held that the "absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints." The ALJ must also consider "the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the frequency, duration, and

15

intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions." Id.

The ALJ is not required to specifically discuss each Polaski factor as long as the analytical framework is recognized and considered. Pelkey v. Barnhart, 433 F.3d 575, 578 (8th Cir. 2006) (citing Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004). "A disability claimant's subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those complaints into question." Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006). Although "an ALJ may not disregard a claimant's subjective complaints of pain solely because there exists no evidence in support of such complaints . . . an ALJ may disbelieve a claimant's subjective reports of pain because of inherent inconsistencies or other circumstances." Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004) (citation omitted); see also Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002) ("an ALJ is entitled to make a factual determination that a [c]laimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary").

Here, the ALJ recognized the correct standard for assessing allegations of pain, and applied that standard properly to the evidence. From this Court's review of the medical record, the ALJ did not misread or misrepresent the record. As the ALJ noted, the MRIs and physical examinations of Plaintiff did not provide objective evidence of disabling pain. Also, as the ALJ noted, while Dr. Ramesh opined that Plaintiff could not sit or stand for prolonged periods of time, and that this would make it difficult for her to

16

work, he did not opine that she could not work at all, and the ALJ incorporated a sit/stand option every 30-45 minutes into his RFC assessment and hypothetical question to the VE.

Nurse Limbaugh did assert that Plaintiff was "disabled." As a nurse practitioner, she was not an "acceptable medical source" to establish "a medically determinable impairment." See 20 C.F.R. § 416.913(a)(1)-(5). But as the Commissioner now concedes, nurse practitioners are specifically listed by the Commissioner as "other" medical sources whose opinions as to the severity of a claimant's impairment and the effect of the impairment on the claimant's ability to work are entitled to consideration by the ALJ. See id. § 416.913(d)(1). However, statements by a medical source, even a treating physician, that a claimant is disabled "are not medical opinions but opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner]." Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002) (quoting Cruze v. Chater, 85 F.3d 1320, 1325 (8th Cir. 1996)). "Such statements simply are not conclusive as to the ultimate question of disability." Cruze, 85 F.3d at 1325 (citation omitted).

Furthermore, although the ALJ did not specifically note that Nurse Limbaugh was an "other" medical source, he did assess the weight to be given her opinion, finding that it deserved only slight weight because it was inconsistent with the exam results obtained at the clinic. The Court concludes that this was a proper exercise of the ALJ's discretion on the matter. In determining what weight to give opinions of "other" medical sources, as opposed to opinions of treating physicians, "the ALJ has more discretion and is permitted

17

to consider any inconsistencies found within the record." Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005) (citing 20 C.F.R. § 416.927(d)(4)).

The ALJ did not just consider the lack of objective medical evidence supporting the severity of pain alleged by Plaintiff. The ALJ also pointed to Plaintiff's refusal to see a neurosurgeon as inconsistent with her allegations of disabling pain. This was a valid factor to consider. See Weiler v. Apfel, 179 F.3d 1107, 1110 (8th Cir. 1999) (noting that plaintiff's refusal of surgery for carpal tunnel syndrome undermined his allegations that the condition, or its psychological effect, was disabling); Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991) (stating that the ALJ may properly consider a claimant's willingness to submit to treatment in determining the sincerity of claimant's allegations of pain; claimant's failure to undergo a biopsy to determine cause of pain, supported ALJ's discrediting claimant's allegation that pain rendered him bedridden).

In addition, the ALJ considered Plaintiff's nonexistent work history as detracting from her credibility. The fact that Plaintiff did not work before her alleged disability onset date when she was approximately 40 years old, was a relevant factor in the determination of whether Plaintiff was fully credible with regard to the extent of her pain. See Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005) (noting that a claimant's poor work record was relevant to the ALJ's credibility analysis); Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) ("A lack of work history may indicate a lack of motivation to work rather than a lack of ability.") (citing Woolf v. Shalala, 3 F.3d 1210,

18

1214 (8th Cir. 1993) (stating that a claimant's credibility is lessened by a poor work history)).

As noted above, the ALJ found an inconsistency between Plaintiff's testimony about her daily activities and her report of her daily activities which she submitted with her application for benefits. It is true that on her benefits application, Plaintiff did not mention that her husband and daughter helped her with household tasks, while at the hearing she testified that they did, but the activities noted on the application were quite limited. Nevertheless, in sum, the Court concludes that the ALJ adequately explained the valid reasons why he discounted Plaintiff's allegations that her pain was of such severity as to preclude even light work which afforded her a sit/stand option every 35 to 40 minutes at the work station. As is true in many disability cases, there is no doubt that Plaintiff is experiencing pain; "the real issue is how severe that pain is." See Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (citation omitted}. "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall, 274 F.3d at 1218; see also Pelkey, 433 F.3d at 578-79 (holding that the ALJ's decision that claimant, who had degenerative disc disease of the cervical and lumbar spines, could perform light work was supported by substantial evidence).

**Combination of Impairments**

Plaintiff also argues that the ALJ committed reversible error by failing to assess Plaintiff's combination of impairments and to determine the total impact which the combination had upon her ability to engage in substantial gainful activity. It is true that

the ALJ must consider impairments in combination.  See 20 C.F.R. § 404.1523; Anderson v. Heckler, 805 F.2d 801, 805 (8th Cir. 1986).  But here, Plaintiff only asserted one reason that she could not work – her back pain.  This is not a case such as those cited by Plaintiff, involving multiple and different physical and mental impairments.

## CONCLUSION

The Court concludes that the ALJ's decision that Plaintiff was not disabled is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

The parties are advised that they have eleven (11) days to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.

*Audrey G. Fleissig*
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 17th day of January, 2008.